**BOARD OF REGENTS OF the STATE OF FLORIDA, acting for and on behalf of the University of Florida, Plaintiff-Appellee,**

**v.**

**Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare, Defendant-Appellant.**

**No. 78–1197.**

United States Court of Appeals, Fifth Circuit.

Dec. 15, 1978.

Nickolas P. Geeker, U. S. Atty., Pensacola, Fla., James C. Pyles, Baltimore, Md., Barbara Allen Babcock, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendant-appellant.

Ashmun Brown, Assoc. University Atty., Gainesville, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, GOD-BOLD and FAY, Circuit Judges.

GODBOLD, Circuit Judge:

This case involves a dispute between a hospital which serves as a provider of health services under the Medicare Program, 42 U.S.C. §§ 1395 et seq., and the Department of Health, Education and Welfare (HEW), concerning the amount of reimbursement that the hospital is entitled to receive from Medicare for some of its "educational costs."

The hospital is Shands Teaching Hospital and Clinic, a part of the University of Florida Medical School, a 300-bed facility for treatment and for the training of doctors, dentists, nurses, pharmacists and persons in related professions. The educational costs in dispute involve the time dedicated by interns and residents to the outpatient clinic of the hospital. All agree that this is an educational cost under 20 C.F.R. § 405.421 (1977), but the fiscal intermediary[1] disallowed it as a reimbursable cost under Part A of the Medicare Program. The hospital appealed to the Provider Reimbursement Board,[2] 42 U.S.C. § 1395oo, which sustained the intermediary. On appeal, the Secretary, 42 U.S.C. § 1395oo, affirmed the Board. The hospital sought review in the district court, 42 U.S.C. § 1395oo (f), which held the cost in question reimbursable under Part A of the program.

The Medicare Program is divided into two parts. Part A reimburses providers 100% of the "reasonable cost"[3] of inpatient services provided to program beneficiaries,[4] and it is funded out of social security taxes. Id. §§ 1395c–1395i–2. Part B is a voluntary insurance program that reimburses providers 80% of the "reasonable charge" or "reasonable cost"[5] of outpatient services. Id. § 1395l. It is funded out of premium payments made by enrollees and appropriated federal funds. Id. §§ 1395j–1395w.

The regulations recognize that many providers engage, as does Shands Hospital, in educational and training programs which Medicare will support. The support is not, however, through grants or subsidies but through recognizing as an "allowable cost," reimbursable to the provider, an "appropriate part" of the net cost of a provider's "approved educational activity." 20 C.F.R. § 405.421 provides:

(a) *Principle.* An appropriate part of the net cost of approved educational activities is an allowable cost.

(b) *Definitions.*

(1) *Approved educational activities.* Approved educational activities means formally organized or planned pro-

---

**1.** Fiscal intermediaries are the fiscal conduits that directly reimburse providers for medical services rendered to Medicare beneficiaries. The fiscal intermediaries have the additional duty of determining the amount of reimbursement a provider is entitled to in the first instance. Appellee's fiscal intermediary is Blue Cross of Florida, Inc.

**2.** Hearings before the Board are adversary proceedings. The provider is entitled to be represented by counsel, introduce evidence, and examine and cross-examine witnesses. 42 U.S.C. § 1395oo (c).

**3.** Reasonable cost is defined by the statute to be "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for vari-

ous types or classes of institutions, agencies, and services . . . .. Such regulations shall (i) take into account both direct and indirect costs of providers of services . . . .. Id. § 1395x(v)(1)(A)."

The regulations contained in 20 C.F.R. §§ 405.401–488 specify the accounting methods used to compute reasonable cost.

**4.** *See* 42 U.S.C. § 1395f(b)(1). Beneficiaries receiving care under Part A of the program, however, must pay an annual deductible, *id.* § 1395e(b), as well as a coinsurance amount, *id.* § 1395e(a).

**5.** Reasonable charge is the standard for reimbursement of services enumerated in 42 U.S.C. § 1395k(a)(1). *See id.* § 1395l (a)(1). Reasonable cost may be the reimbursement rate for services covered by 42 U.S.C. § 1395k(a)(2). *See id.* § 1395l (a)(2).

grams of study usually engaged in by providers in order to enhance the quality of patient care in an institution. These activities must be licensed where required by State law. Where licensing is not required, the institution must receive approval from the recognized national professional organization for the particular activity.

(2) *Net cost.* The net cost means the cost of approved educational activities (including stipends of trainees, compensation of teachers, and other costs), less any reimbursements from grants, tuition, and specific donations.

(3) *Appropriate part.* Appropriate part means the net cost of the activity apportioned in accordance with the methods set forth in these principles.

(c) *Educational activities.* Many providers engage in educational activities including training programs for nurses, medical students, interns and residents, and various paramedical specialties. These programs contribute to the quality of patient care within an institution and are necessary to meet the community's needs for medical and paramedical personnel. It is recognized that the costs of such educational activities should be borne by the community. However, many communities have not assumed responsibility for financing these programs and it is necessary that support be provided by those purchasing health care. Until communities undertake to bear these costs, the program will participate appropriately in the support of educational activities customarily or traditionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in increased costs resulting from redistribution of costs from educational institutions or units to patient care institutions or units.

Shands' educational program was approved. We turn then to consider whether and to what extent the education costs consisting of intern and resident services rendered in Shands' outpatient clinics were "allowable costs" under Part A.[6]

Under subsection (a) of § 405.421, only an "appropriate part" of a provider's net educational cost is "allowable." Under subsection (c) an appropriate part means an "apportioned" part. The regulation entitled "Methods of apportionment under Title XVIII" provides that hospitals with more than 100 beds must use the "Departmental Method of apportionment for accounting periods starting after December 31, 1971." 20 C.F.R. § 405.404(b). The hospital, therefore, was required to apportion its costs by the Departmental Method of accounting. As its name indicates, the Departmental Method requires providers to *allocate* its costs on a departmental basis, *id.* § 405.-452(b)(1), by means of the "step-down" method of cost finding. *Id.* § 405.453(d). The step-down cost-finding method requires providers to allocate the costs of non-revenue producing departments to the revenue producing departments they serve. *Id.* § 405.431(d)(1). Intern and resident programs are treated as non-revenue producing departments. *See id.* § 405.522(b). Accordingly, Shands was required to allocate the cost of its intern and resident program to the revenue producing departments served by that program. The allocation of costs to departments, as provided by these regulations, responds to the requirement of "apportionment." This construction is consistent with 20 C.F.R. § 405.522, which specifically covers intern and resident services in approved teaching programs.

*Interns' and residents' services in approved teaching programs.*

(a) Title XVIII of the Act gives recognition to hospital teaching programs which are duly approved in their respective fields by the Council on Medical Education of the American Medical Association. . . .

---

**6.** The only question presented by this appeal is whether the educational costs represented by the resident and intern time spent in the hospital's outpatient clinic are *reimbursable under* Part A of the program. We do not decide whether the disputed costs are properly reimbursable under Part B of the program.

(b) Services of interns and residents in such approved programs are explicitly excluded from the definition of "physicians' services" and are covered as hospital services. This exclusion applies whether or not the intern or resident may be authorized to practice as a physician under the laws of the State in which he performs his services. In accordance with the basis for payment under the health insurance program for services provided by participating hospitals, the cost of the services of interns and residents is reimbursable to the hospital, specifically as a component of allowable costs defined by the principles of reimbursement for provider costs set forth in Subpart D of this Part, an appropriate share of the provider's total allowable costs is reimbursable under the health insurance program. (For purposes of including services of interns and residents as an element of allowable cost in accordance with these principles, recording and reporting by the hospital of the specific services rendered to individual beneficiaries is not necessary.)

(c) Conversely, services of interns and residents are not reimbursable under the health insurance program on the basis which applies to physicians' services, i. e., reasonable charges (see §§ 405.501–405.-508). This distinction with respect to the basis for the health insurance program reimbursement applies to services of interns and residents whether covered by the hospital insurance program or the supplementary medical insurance program. *Outpatient services which are provided by a hospital, including intern and resident services where involved, are reimbursed to the hospital under the supplementary medical insurance program to the extent of 80 percent of the cost of the services rendered to beneficiaries* after recognition of the deductible amount (see § 405.240(c)). The beneficiary will incur the expense of the deductible and coinsurance amounts as determined on the basis

of the hospital's charges to the beneficiary. Hospital charges may include a charge for the services of interns and residents as a specific item, or these services may be included in the general charges to the beneficiary made by the hospital for the covered services it provides. (Emphasis added.)

The language which we have italicized prescribes in a straightforward manner that a provider will be reimbursed for the costs of outpatient services, including the costs of intern and resident services, at the 80% rate applicable to Part B of the program.

Against this background, we examine Shands' handling of the time devoted by the interns and residents to the outpatient clinic. In preparing its 1973 cost report, Shands conducted a study to determine the amount of time spent by interns and residents in its various patient care centers, and used this report to allocate the educational costs of interns and residents to the specific service centers of the hospital that they served.[7] The study showed that interns and residents spent approximately 20% of their time in the outpatient clinic. The hospital took 20% of its overall educational costs, representing intern and resident time devoted to the outpatient clinic, and reallocated this to inpatient service centers. The result of this reallocation was to make the outpatient portion of the hospital's educational costs reimbursable under Part A of the program, which reimburses services provided to inpatient beneficiaries at a rate of 100%, rather than under Part B, which reimburses at a rate of 80% of the charge or cost of outpatient services. The district court approved this reallocation, concluding that all of appellee's educational expenses are reimbursable under Part A of the program.

Before the district court, and on appeal, the hospital has taken the somewhat simplistic position that once it is established that an educational cost has been incurred and that the educational program is ap-

---

7. For a provider to be eligible for Medicare reimbursement it must provide HEW with reliable data showing the cost of its services. 20 C.F.R. § 405.453(a) (1977). The regulations require providers to submit annual cost reports. *Id.* § 405.453(f).

proved, then *ipso facto* the hospital is entitled to 100% reimbursement. Under the hospital's interpretation of § 405.421, it does not matter whether an educational cost was incurred in the course of providing inpatient or outpatient services. This theory was not adopted by the district court nor can we accept it. It is founded upon a misunderstanding of the definition of "appropriate part" contained in 20 C.F.R. § 405.522(b)(3). As noted, appropriate part is defined as the net cost of approved educational activities *apportioned* in accordance with the regulations. The hospital has seized upon the regulations' ambiguous use of the term apportionment as support for its novel proposition that educational costs, unlike all other costs incurred in providing services to Medicare beneficiaries, do not have to be *allocated.* At oral argument counsel for the hospital argued that apportionment only requires a division of educational costs between Medicare and non-Medicare beneficiaries. Under this view the amount of reimbursement the hospital is entitled to receive for its educational costs under Part A would be solely determined by the utilization rate of inpatient services by Medicare beneficiaries.[8] The hospital finds some support for its definition of apportionment in the common sense meaning of that term as well as the use of the term in some of the regulations. For example, in the regulation entitled "Apportionment of allowable costs," 20 C.F.R. § 405.403, apportionment seems to be used to refer to a division of costs between Medicare and non-Medicare patients.[9] While the hospital is correct in its assertion that apportionment means the division of costs between Medicare and non-Medicare patients, the hospital fails to recognize that an accurate apportionment of costs requires the allocation of costs to the hospital department providing the services to the Medicare beneficiaries. Allocation of costs is needed for three reasons. First, the Medicare program reimburses providers of health services under Part A only for the reasonable cost of *services rendered Medicare beneficiaries.* 42 U.S.C. § 1395x(v)(1)(A). Indirect costs, incurred in the course of providing services to beneficiaries must, therefore, be allocated to the medical department that actually provides the services to the beneficiaries. Allowing Medicare providers to allocate educational costs without regard to the provision of medical services would defeat the guiding Medicare reimbursement principle that providers are only entitled to reimbursement for the reasonable cost of medical services provided. The second reason for allocation flows from the fact that Medicare patients utilize the different medical departments within a hospital to varying extents. 20 C.F.R. § 405.403(c). In recognition of this, an accurate division of costs between Medicare and non-Medicare patients requires an allocation of indirect costs to the individual departments providing the services. Finally, to maintain the integrity of the different rates of reimbursement provided for under Parts A and B of the program, costs incurred in providing outpatient care must be allocated to the appropriate outpatient cost center. The same is true, of course, for the costs of providing inpatient care.

The regulations make clear that the theory of apportionment of costs subsumes the requirement of allocation of costs. The Departmental Method of accounting, the method Shands is required to use, compels the allocation of all indirect costs to the department providing the medical services. We conclude, therefore, that apportionment of costs as defined by the regulations requires an allocation of all costs, direct and indirect, to the hospital's various cost centers.

To the extent the hospital premises its contention that the Medicare Program is

---

8. The parties agree that the disputed costs are educational costs incurred in approved educational activities.

9. Subsection (a) provides that "reimbursement under the title XVIII health insurance program involves a determination of (1) each provider's allowable costs for producing services, and (2) the share of these costs which is to be borne by title XVIII."

intended to support educational activities at 100% of their cost on the general language of 20 C.F.R. § 405.421(c), that argument must also be rejected. It disregards subsections (a) and (b) of the same section which limit Medicare support to an "appropriate part" of cost, and subsection (c), which states that the Medicare program will only "participate appropriately" in the support of educational activities. It also disregards the specific provision of 20 C.F.R. § 405.-522(c), which sets the rate of reimbursement for intern and resident services provided to outpatient beneficiaries at 80%.

The hospital attempts to avoid the allocation requirement implicit in the statutory scheme and in § 405.522, and made explicit in the apportionment regulations, by a theory which might be called "transferability of skills": skills acquired by residents and interns in the outpatient clinic are ultimately applied to the benefit of inpatient beneficiaries and therefore the cost of acquiring the skills must be reimbursed at the 100% inpatient rate. This theory ignores the distinction between services and benefits. Assuming that inpatient beneficiaries derive a *benefit* from skills acquired by interns and residents from their outpatient training, Shands has not explained how this relates to the principle that Medicare only reimburses providers under Part A for the costs incurred for providing inpatient beneficiaries with *services*. See 42 U.S.C. § 1395x(v)(1)(A); 20 C.F.R. §§ 405.401–402 (1977).[10] Also the argument proves too much. One may fairly assume that skills acquired in inpatient service centers of the hospital are equally as transferable to outpatient care.

In other respects the hospital has accepted that educational costs must be allocated to the service centers where incurred. Based on its time study Shands allocated its intern and resident costs to 15 cost centers. For example, the time study indicated that interns and residents spent a portion of their time in the hospital's delivery rooms. A corresponding portion of educational costs were allocated to the delivery room cost center. Because the delivery room was not utilized by Medicare patients, this portion of the hospital's educational costs were not reimbursed, a result the hospital does not contest.

HEW's position is that to be reimbursable an educational cost must not only be incurred in an approved program but must also be allocated to the service center where incurred, as required by the accounting regulations, discussed above, and, within the cost center, cost must be divided between Medicare and non-Medicare beneficiaries of the service. Thus, a three-step process is followed to apportion costs between Medicare and non-Medicare patients: 1) *allowable* costs for providing services are ascertained; 2) allowable costs are *allocated* to the provider's various cost centers; and 3) within each cost center allowable costs are *divided* between Medicare and non-Medicare patients according to the cost center's Medicare utilization rate. The district court assumed that HEW's criteria for reimbursement applied but concluded that the criteria had been satisfied.[11] Allocation of cost was met, the court found, because the hospital's outpatient clinic is an integrated part of the inpatient facility and the two should be treated as one unit. This is not allocation as provided by governing law but

---

**10.** In addition to changing the rate of reimbursement, the total amount of reimbursement can also be affected by reallocation of costs because of the varying utilization rates by Medicare beneficiaries of different services.

**11.** The final requirement of apportionment, division of costs between Medicare beneficiaries and non-Medicare recipients of services, was met, according to the court, because "the defendant has not disputed the overall allocation of costs by the provider's facility under Part A between Medicare and non-Medicare patients."

Although the district judge used the term "allocation," he obviously was referring to the division of costs between Medicare and non-Medicare beneficiaries according to the Medicare utilization rate of the hospital's services. HEW has not questioned the hospital's utilization rate data. Contrary to the district court's statement, the record indicates that the utilization rate was determined on a department by department basis. As a result the division criterion was satisfied by the hospital.

is a finding that allocation may be dispensed with in a hospital that is "integrated." Considering the purpose which the allocation of costs is intended to serve—an accurate apportionment of costs for services rendered Medicare beneficiaries—it is impermissible to treat an entire hospital as a single cost center. Due to the varying Medicare utilization rates of different hospital departments, allocation of costs to individual departments is needed to accurately apportion costs between Medicare and non-Medicare patients, regardless of the degree of integration of hospital services.

The dispute between HEW and the hospital has centered around the need to allocate educational costs to the department in which they arose. Because we have concluded that educational costs must be allocated in the same way as all other costs, the district court must be reversed and the decision of the Secretary reinstated.

REVERSED and REMANDED.